MAY, J.
 

 The defendant appeals his conviction and sentence on four counts of robbery and one count of attempted robbery. He argues the court erred in denying his motion for mistrial and permitting the admission of a partial statement of the defendant’s. We disagree and affirm.
 

 Upon remand from this court in
 
 Womack v. State,
 
 942 So.2d 955 (Fla. 4th DCA 2006), the defendant was retried on four counts of robbery with a firearm and one count of attempted robbery with a firearm. The five victims testified that two men, one with a large revolver and another with an automatic handgun, robbed them in the parking lot of a Holiday Inn. The men were dressed in black or dark blue, ski masks, long sleeve tee shirts, and long dark pants.
 

 After the robbery, the two men ran to a car parked a few spaces away and pulled out of the parking lot. No one saw a third person in the car, but one victim believed the two men had a driver based on how quickly the car left the lot. The victims were unable to see the tag number, make or model of the ear because another car entered the lot at the same time. The people in the other car believed the getaway car to be a white Altima. The victims relayed this information to the police, who issued a BOLO.
 

 An officer driving in an unmarked vehicle on 1-95 noticed a white Altima pass him. He testified that he saw two people in the car, but an additional person may have been in the back seat. He followed the Altima until it stopped. The passenger got out, ran toward him, and hopped over a fence. The driver got out and ran along the houses. A third person could have exited the car without him noticing.
 

 Another witness saw someone in a dark hooded sweatshirt run down the alleyway behind his house and duck down amongst parked trucks. When he shined a flashlight under the trucks, he saw the same person, now wearing a white tank top. He later found a black hoodie rolled up under a parked truck and gave it to police.
 

 A canine officer and his K-9 searched the area, found and opened a van. The K-9 jumped inside and bit the defendant. The K-9 then alerted on a truck, crawled under it, and the officer was able to apprehend the co-defendant.
 

 A detective found a Visa credit card in the name of one of the victims on the ground. A crime scene officer found a black knit ski mask on the ground by the passenger side of the Altima. He searched the interior and found two ferry tickets on the front passenger floorboard, belonging to one of the victims. He also recovered a white sock, brown gloves, and a cell phone from the back seat. DNA found in the gloves belonged to the defendant. A blue/black knit cap found in the bushes matched the co-defendant’s DNA. While at the police station, the officer lifted the defendant’s prints from the Altima’s passenger door and other prints matching the co-defendant.
 

 Another crime scene officer collected property from the defendant’s hospital room, including a wallet with $250 and another loose $210. She collected property from the co-defendant’s room, including $497 in his wallet.
 

 Upon release from the hospital, the defendant was taken to the police station and interrogated by the detective and another officer. The detective read the defendant
 
 *881
 
 his Miranda
 
 [1]
 
 warnings, insured that he understood them, and obtained his signature. The detective began by telling the defendant to explain what happened in his own words. The defendant stated: “I see, well I don’t want to incriminate myself, you know I really don’t, cause I just don’t want to incriminate myself man. I was just in the van smoking man and before he grab, I really don’t, I don’t know what I’m in here for. What I’m being charged with? They tell me something about shooting.” The defendant then denied knowing the co-defendant or having any involvement in the crime.
 

 When the defendant testified at trial, his story was different. He testified that he was hanging out in Riviera Beach socializing with neighbors when he met the co-defendant, who had recently been released from prison. The co-defendant asked if they wanted to go to a club; the defendant decided to go with him.
 

 They headed to a club in Fort Lauder-dale or Miami. The three agreed to pitch in and get a motel room. The driver pulled the Altima into the Holiday Inn. Neither the driver nor the co-defendant had masks or weapons, and they did not discuss any type of robbery. The defendant stayed in the backseat of the car while the other two got out. They were gone about ten to fifteen minutes when they returned wearing masks; the co-defendant had a silver gun. When the driver returned to the driver’s seat, the defendant began to panic and yelled for them to take him home.
 

 The car finally stopped in West Palm Beach. The defendant was not familiar with the area and ran because he was afraid. He did not initially know law enforcement was behind them. He jumped a fence and hid in a van. He heard barking and was told to get out of the van. Before he could, an officer opened the van and let a dog enter. The dog bit him. The officer instructed the defendant to roll over. When he did, the dog bit him again before the officer called the dog off. He admitted that he made up a story to tell the detective because he did not know what was going on, was afraid, and in pain.
 

 He explained that he ran from law enforcement because he did not know it was the police and thought the others may have robbed drug dealers. He was wearing a black dress shirt, light brown pants, and dress shoes. He never put on gloves. His mother gave him around $250. He placed the money in his wallet, but the $210 found in his pocket after his arrest was not his. He stated that he chipped in approximately $20 toward the hotel room and got the money from working. He admitted that he had one prior felony conviction, which he pled to because he was guilty of the charge.
 

 The jury found the defendant guilty on four counts of robbery and one count of attempted robbery. The issues raised on appeal concern the State’s partial use of the defendant’s statement to the detective during interrogation, the court’s denial of the motion for mistrial, and the admission of hearsay evidence.
 

 Prior to trial, the parties discussed the admissibility of the defendant’s statement. The defense argued that the defendant asserted his right against self-incrimination at the very beginning of the interview.
 

 The State proffered the detective’s testimony concerning what took place prior the defendant’s statement. At no time prior to the recorded statement did the defendant say he was not going to answer any questions or that he wanted an attorney present. The defendant was not threat
 
 *882
 
 ened and never indicated that he did not want to answer questions. The detective stopped the interview when the defendant said that he’d “rather have a lawyer.”
 

 The defendant’s statement was played for the court. After listening to the beginning of the recorded statement, the trial court found that it did not reflect whether the defendant actually waived his rights, so the court ordered the State to recall the detective for an additional proffer.
 

 The detective testified that he read the warnings before turning on the tape. The defendant answered all questions and never said he was not going to speak to the officers. The defendant signed the back of the card and then the tape was turned on.
 

 When the court asked the detective if any conversations occurred before the tape was turned on, the prosecutor handed the detective a document. Before the detective could respond, defense counsel objected and asked to see the document. The prosecutor stated that it was a witness’s statement from one of the officers, indicating that the detective “read Miranda to Womack who stated he understood and signed the Rights card.”
 

 At that point, defense counsel moved for a mistrial. The trial court denied the motion, but continued to question the detective about his personal knowledge. He opined that he had an “independent recollection” that the defendant told him he understood his
 
 Miranda
 
 rights. The detective always reads directly from the card and asks the defendant if he understands each of his rights in all interrogations.
 

 Defense counsel declined to further question the detective, but again moved for a mistrial, arguing that although the detective asked the defendant if he understood, he never asked, “having read those Rights and understanding those Rights, do you wish to talk to me.” The trial court found the State’s initial proffer was insufficient to establish the defendant had waived his rights, but found the detective credible, and that the defendant waived his rights. The court found the defendant’s initial statement equivocal. The court also found that although the prosecutor’s conduct was improper, it did not warrant a mistrial. The court allowed the detective to testify to the first six pages of the defendant’s statement.
 

 At the end of the detective’s testimony, the court admitted the cassette tape of the interview with the defendant into evidence for record purposes only; it was not played for the jury. The written transcript was not introduced into evidence.
 

 The defendant makes two arguments as to why the trial court erred in allowing the detective to testify about the contents of the defendant’s custodial statement. First, the defendant argues that he never affirmatively waived his
 
 Miranda
 
 rights. Second, he argues that he unequivocally invoked his right against self-incrimination at the beginning of his interrogation. Last, the defendant argues the court should have granted a mistrial when the prosecutor provided the detective with the witness’s statement. We disagree with all of the arguments and affirm.
 
 [2]
 

 
 *883
 
 “[A] trial court’s ruling on a motion to suppress comes to the appellate court clothed with a presumption of correctness, and the reviewing court must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court’s ruling.”
 
 Pagan v. State,
 
 830 So.2d 792, 806 (Fla.2002). Review of the trial court’s application of the law to the facts is
 
 de novo. See Alvarez v. State,
 
 15 So.3d 738, 741 (Fla. 4th DCA 2009). We defer to a trial court’s factual findings if supported by competent, substantial evidence.
 
 Id.
 
 at 741.
 

 Here, the trial court found the detective to be a credible witness. During the proffer and at trial, the detective testified that the defendant understood and waived his rights. These findings are supported by competent, substantial evidence.
 

 The more difficult argument is whether the defendant’s comments at the beginning of the interrogation amounted to an unequivocal invocation of his right against self-incrimination. The defendant relies on
 
 Cuervo v. State,
 
 967 So.2d 155 (Fla.2007) and
 
 Almeida v. State,
 
 737 So.2d 520 (Fla.1999).
 

 Whether a response is equivocal is an objective question based on the circumstances.
 
 Cuervo,
 
 967 So.2d at 163 n. 7. “A revocation of a waiver of the right to remain silent is unambiguous if a reasonable police officer under the circumstances would understand that the suspect is invoking the right.”
 
 Alvarez,
 
 15 So.3d at 743 (footnote omitted). Factors for making this determination include whether the response refers to specific questions about the crime or about the underlying right to cut off all questioning.
 
 Cuervo,
 
 967 So.2d at 163 (clarifying
 
 State v. Owen,
 
 696 So.2d 715, 719 (Fla.1997) through
 
 Almeida,
 
 737 So.2d at 523). The inflection and tone of the defendant’s response are also important when a tape recording exists.
 
 See Bailey v. State,
 
 31 So.3d 809, 816-16 (Fla. 1st DCA 2009).
 

 The first step in this evaluation is to objectively consider what the defendant said and whether it constitutes an unequivocal invocation of that right.
 
 Cuervo,
 
 967 So.2d at 172. If the defendant’s statement is equivocal, there is no need to end the interrogation.
 

 The trial court found the defendant’s initial statement to be equivocal. We agree. The defendant’s initial statement was equivocal in light of his rambling response and his questions about why he was at the police station and what he was being charged with. An officer that heard the response could reasonably believe the defendant was simply inquiring about the information.
 

 Even if the admission was error, we find it harmless.
 
 Ventura v. State,
 
 29 So.3d 1086, 1089-91 (Fla.2010) (citing
 
 State v. DiGuilio,
 
 491 So.2d 1129 (Fla.1986)). The written transcript was not introduced into evidence, and the cassette tape was not played for the jury. Therefore, any error in the detective’s testimony concerning a limited portion of the defendant’s statement was harmless beyond a reasonable doubt.
 

 The defendant next argues the trial court erred in denying his motion for mistrial when the State provided the detective with the statement of another officer indicating that the detective had read the defendant his rights and obtained the defendant’s signature after indicating he understood them. We disagree. The detective testified that he had an independent recollection of the events. More importantly, the incident occurred during a proffer, not in front of the jury.
 

 
 *884
 
 We further find no error in the admission of the hearsay testimony from the occupants of the car that entered the parking lot as the defendants left, which identified the get-away car as an Altima. The trial court properly found the testimony constituted a spontaneous statement.
 
 See
 
 § 90.803(1), Fla. Stat. (2008). For all of these reasons, we affirm.
 

 Affirmed.
 

 WARNER and TAYLOR, JJ., concur.
 

 [1]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
 

 [2]
 

 . In an odd twist, most of the evidence introduced at the first trial was missing from the circuit court clerk's office. The director of criminal courts testified that the State had introduced 40 pieces of evidence against the defendant in the first trial. Several months later, the clerk's office realized that it no longer had most of the evidence in its custody. The only evidence still in its possession was the two firearms and some ammunition. The recovered guns were admitted into evidence. The director identified State's exhibit 23 as the evidence checklist prepared by the courtroom clerk as evidence previously introduced and retained in the clerk's possession.