SAWAYA, J.
At the age of nineteen, Stephen Horne was interrogated by the police and became the confessed murderer of his father. Horne’s recorded (DVD) confession was played to the jury in his first-degree murder trial, and the confessed murderer became the convicted murderer. He was also convicted of robbery with a firearm and possession of a short-barreled shotgun. The question presented in this appeal is whether Horne, after he waived his Miranda[1] rights, unambiguously reasserted his constitutional right of silence prior to making any incriminating statements. If he did, the trial court erred in denying his motion to suppress his confession, and if revealing the confession to the jury is not harmless error, then Horne is entitled to reversal of his convictions and a new trial.
In that confession, Horne revealed much about himself and his involvement with his father’s death. Horne considered his father to be a useless drug addict whom he hated because he long ago abandoned Horne and his mother. Horne’s mother was a convicted felon and had been recently released from prison. Horne lived a hardscrabble life, and although he resided with his grandmother, he was largely left to his own devices. His mode of transportation was a bicycle, he worked menial jobs, and with only an eighth-grade education, his future offered little hope for improvement. Like his father, Horne was an avid user of drugs. One day after receiving information that his father had obtained prescription narcotics, Horne lured his father from Tampa to Hernando County with the ruse that he would take his father to a place where his father would be able to sell the narcotics he had just obtained (the drugs were in pill form and had a street value of ten dollars per pill). Horne and an accomplice drove the father to an abandoned house in the ac *901 complice’s car, and when the father got out, Horne shot him in the back with a short-barreled shotgun. As his father lay mortally wounded on the ground, Horne shot him three more times. Horne then removed $640 dollars and twenty-two pills containing narcotics from the pockets of his slain father and divided the pills and the money with the accomplice.
The confession was obtained by the police after Horne voluntarily went with them to the police station for questioning. After he waived his Miranda rights, Horne was interrogated by two detectives. Detective Loydgren began the interrogation while Detective Faulkingham monitored the proceeding from another room. The interrogation spans a time period of a little less than two and a half hours, including intermissions when Horne was left alone in the interrogation room. Horne claims he reasserted his right to remain silent prior to the first intermission, thus requiring the police to end the interrogation. We emphasize that at this point, Horne had not yet made incriminating statements about his involvement in his father’s murder. So with that introduction, we will present the pertinent part of the interrogation, supplying emphasis where appropriate:
Detective Loydgren: It doesn’t really— you know, if you’re a kid, I guess— unless you’re a convicted felon on paper. As a juvenile, I don’t know if it carries the same weight as an adult, so I’m— I’m just trying to figure out what you’re worried about with having a gun in the house. ‘Cause grandma also said she seen you with a handgun before, so that’s why I’m asking you. You’re telling me you don’t never — don’t have a gun ‘cause you’re worried about having felony charges. Well, we can — we can get past the felony charges on the gun. Obviously you had shotgun shells given to you. You have ammunition. You’ve got a shotgun that you had that was your buddy’s, you’re saying. I’m sure that we’re talking about the same shotgun.
Defendant: I’m done talking.
Detective Loydgren: Okay.
Defendant: I don’t know where this is leading to.
Detective Loydgren: You don’t know where it’s leading to?
Defendant: Um—
Detective Loydgren: Okay. Well, if I told you I had a few guys out at your house right now and we’re gonna execute a search warrant at your house—
Defendant: That’s fine.
Detective Loydgren: Okay. That’s fine. I’m just letting you know. You haven’t talked to your father, right?
Defendant: Last night I talked to him. I’m done talking.
Detective Loydgren: Okay.
Defendant: Can I go home now?
Detective Loydgren: Not right yet. You don’t want to talk to me anymore then? [At this point, Horne leaned back in his chair with his arms folded on his chest, looked directly at the Detective, and clearly shook his head no. But the Detective continued.] Okay. You know — you know what I find amazing, though? You haven’t once asked me about your father since you’ve been in here.
Defendant: I’ve been trying. You keep cutting me off.
Detective Loydgren: I haven’t cut you off. About that — I apologize if I cut you off about that. I just said you talk to him—
Defendant: I keep asking — why you keep asking me about my dad? I’m done.
*902 Detective Loydgren: Okay. Well, I’ll let you sit here for a minute. [The detective leaves the interrogation room and Horne remains alone.]
After Detective Loydgren left the interrogation room, Horne was left alone for several minutes. Detective Faulkingham subsequently entered the room with Horne to commence part two of the interrogation. Remember that Detective Faulkingham had been watching the initial interrogation in another room, so he knew what had previously transpired regarding Horne’s repeated statements that he was “done talking” and wanted to go home. This appears to be part of a strategy where a switch of interrogators and some time alone for Horne to contemplate his crime might prompt him to change his mind about exercising his right to silence and yield a more forthcoming statement from him. The following pertinent discussion took place right after Detective Faulking-ham entered the room:
Detective Faulkingham: Hey, man. How you doing?
Defendant: (Indiscernible).
Detective Faulkingham: Huh?
Defendant: All right.
Detective Faulkingham: Tired? Yeah, me, too.
Defendant: I wanna go home.
Detective Faulkingham: Yeah. All right. Hey, obviously there — there’s some important things going on here. That’s why we asked you to come down here. That’s why I drove all the way out there, gave you a ride here. Detective Loyd-gren, the — the guy you were just talking to, has all the details, you know, about what’s going on, and we want to be able to discuss all that with you.
Defendant: I’m done talking.
Detective Faulkingham: Okay. Don’t you want to know what’s going on or anything like that? I mean—
Defendant: Hum?
Detective Faulkingham: Well, you’re not worried about your dad?
Defendant: I spent all day calling my father.
No sooner than Detective Faulkingham entered the room and greeted Horne, Horne stated, “I want to go home” and “I’m done talking.” Despite unambiguously reasserting his right to silence with Detective Faulkingham (who observed Horne’s prior reassertions to Detective Loydgren), Detective Faulkingham continued to interrogate Horne. Ultimately, Horne discussed the murder of his father and eventually admitted that he bought the shotgun and shot his father with it four times.
Horne contends that when he stated several times that he was “done talking” and wanted to go home, he unambiguously reasserted his right to remain silent, thus requiring the police to end the interrogation. The constitutional right to remain silent, as set forth in the Fifth Amendment to the United States Constitution and article I, section nine, of the Florida Constitution, is guaranteed to every citizen charged with a crime. Despite its constitutional status, this right may be waived, provided the waiver is “voluntarily, knowingly and intelligently” given. Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Horne properly waived his right of silence before the interrogation commenced and he does not contend otherwise. But waiver of that right does not mean that it completely vanishes, never again to reappear. Once waived, a defendant may reassert his right of silence at any time, even in the midst of a police interrogation, and bring a halt to the questioning. Deviney v. State, 112 *903 So.3d 57, 74 (Fla.2013); Braddy v. State, 111 So.3d 810, 830 (Fla.2012); Martin v. State, 107 So.3d 281, 294-95 (Fla.2012); Cuervo v. State, 967 So.2d 155, 162 (Fla.2007).
An individual accused of a crime, especially an accused in the crucible of intense questioning by trained interrogators in the confínes of a police station interrogation room, is not required to reassert his right to remain silent with precise formulation of words or actions. See Deviney; Pierre v. State, 22 So.3d 759, 767 (Fla. 4th DCA 2009). The question that most often arises is how and when does an accused reassert his right to remain silent. The courts have told us. In Miranda, the Court explained that “[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.” Miranda, 384 U.S. at 473-74, 86 S.Ct. 1602 (footnote omitted). Despite the rather broad terminology “in any manner,” the court in Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), declared, albeit in the context of the right to counsel, that reassertion of the right once waived must be unambiguous. Davis, 512 U.S. at 459, 114 S.Ct. 2350. Davis was followed by Berghuis v. Thompkins, 560 U.S. 370, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010), where the Court extended the unambiguous requirement pronounced in Davis to instances where a defendant reasserts his right to remain silent, explaining that “[t]here is no principled reason to adopt different standards for determining when an accused has invoked the Miranda right to remain silent and the Miranda right to counsel .... ” Berghuis, 560 U.S. at 371, 130 S.Ct. 2250. We note that prior to Berghuis, the Florida Supreme Court in State v. Owen, 696 So.2d 715, 717-18 (Fla.1997), applied Davis and its unambiguous requirement to assertions of the right to remain silent. See also Martin, 107 So.3d at 293-94 (repeating that the Davis rationale equally applies to the right to remain silent).
In its most recent decisions, the Florida Supreme Court speaks in terms of “unequivocal or unambiguous” so that invocation of the right previously waived must constitute “an unequivocal or unambiguous request to terminate an interrogation in order to reassert those rights.” Braddy, 111 So.3d at 830 (citation omitted); see also Martin, 107 So.3d at 296 (“[A]n invocation of one’s right to remain silent must be made in clear and unequivocal terms if it follows a previous, knowing and voluntary waiver of one’s Miranda rights.” (citations omitted)). “Unequivocal or unambiguous” means that while a defendant need not “ ‘speak with the discrimination of an Oxford don,’ ” he must clearly state his intention so that a reasonable police officer would understand the defendant’s desire to reassert his right to remain silent. Davis, 512 U.S. at 459, 114 S.Ct. 2350 (quoting Souter, J., concurring in judgment); see also Braddy, 111 So.3d at 830 (“A revocation ‘is unambiguous if a reasonable police officer under the circumstances would understand that the suspect is invoking the right.’ ” (quoting Womack v. State, 42 So.3d 878, 883 (Fla. 4th DCA 2010))); Martin, 107 So.3d at 295 (explaining that the proper standard is whether “ ‘a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent.’ ” (quoting Coleman v. Singletary, 30 F.3d 1420, 1424 (11th Cir.1994))). Once a defendant makes an unequivocal or unambiguous reassertion of his right to silence, the police must scrupulously honor that right and stop the interrogation. Miranda; Braddy; Martin.
When Horne told Detective Loyd-gren “I’m done talking” and asked “Can I *904 go home now?,” Horne made an unequivocal and unambiguous assertion of his right to remain silent and to stop all questioning. It is also clear that Detective Loyd-gren understood Horne’s statement as an invocation of the right to remain silent, a fact demonstrated by Detective Loyd-gren’s query ‘You don’t want to talk to me anymore then?,” followed by Horne clearly shaking his head no, followed by the detective stating “Okay.” And within seconds Horne again stated, “I’m done.” It is also relevant that within seconds of Horne’s last statement “I’m done,” Detective Loyd-gren ceased questioning and left the room, leaving Horne alone in silence. Dixon v. State, 72 So.3d 171, 176 (Fla. 4th DCA 2011) (finding detective’s statement to “hear me out, since you don’t want to talk about the house I’ll talk about the house, so you just hear me out, I’m not gonna ask you any questions,” indicated detective’s understanding that defendant wanted questioning to cease after defendant expressed his desire not to talk anymore); Pierre, 22 So.3d at 767-68 (Fla. 4th DCA 2009) (stating that when a detective fell silent and discontinued questioning after the defendant stated he was not going to say anything and remained silent, “[t]he only interpretation ... is that, as a reasonable police officer, [the detective] understood [the defendant’s] statement to be a demand that questioning cease”). Detective Loydgren properly terminated the interrogation only to have Detective Faulk-ingham improperly start it again without obtaining a waiver of Horne’s reasserted right of silence. What is equally telling is that within seconds after Detective Faulk-ingham entered the room, Horne once again declared, “I want to go home” and “I’m done talking.”
We conclude that the police did not scrupulously honor Horne’s unambiguous and unequivocal assertion of his right to silence and to stop the interrogation. Therefore, the trial court erred in denying Horne’s motion to suppress. Analogous cases from other courts confirm this conclusion is correct. A case strikingly similar is Deviney, where the defendant was being questioned by the police after giving his Miranda waiver. During the interrogation, the defendant stated, “I’m done. I’m ready to go home. Can I leave?” He was told he could not leave and the defendant repeated his statement, “I’m done” and renewed his request to go home. At one point the defendant got up to leave, but the police officers told him that if he attempted to leave, he would be restrained. The defendant sat down and the interrogation continued until the defendant eventually confessed to the crime. In reversing the defendant’s conviction for first-degree murder, the Florida Supreme Court held that “Deviney’s six references to the fact that he was ‘done’ with questioning represented an unequivocal invocation of his right to remain silent and end questioning.” Deviney, 112 So.3d at 77. Addressing the State’s argument that the defendant did not unequivocally indicate his intention to assert his right to remain silent because he continued to talk to the police, the court stated that “Deviney dispelled any such argument by a subsequent reiteration of his wish to end the interrogation, Tm done. I’m ready to go home. Can I leave?’ ” Id. at 78. Similarly, Horne reiterated his statement “I’m done talking” or “I’m done” four times, shook his head no when asked whether he wanted to talk to the detective, and twice requested that he be allowed to go home.
The court in Deviney found the decision in Pierre closely analogous, as do we. In Pierre, a defendant being interrogated by two detectives stated, “I’m not saying anymore” and fell silent for approximately a minute. In reversing the defendant’s conviction, the court held that this statement and silence constituted an unequivocal assertion of the defendant’s right to remain silent necessitating an end to the interro *905 gation. But the interrogation commenced again a minute or two later and the defendant confessed to the crime. Here, the facts are even more compelling. At one point when Horne states “I’m done talking,” the officer asks, “You don’t want to talk to me anymore then?,” and Horne clearly shakes his head no. Just seconds later, Horne repeats “I’m done,” and the detective stops the interrogation and leaves the room.
The conclusion that Horne’s confession should have been suppressed does not end our analysis. In an attempt to salvage its conviction, the State argues that it was harmless error to admit the confession and reveal it to the jury. Erroneous admission of a confession into evidence is subject to a harmless error analysis. Deviney; Ross v. State, 45 So.3d 403, 434 (Fla.2010); Caso v. State, 524 So.2d 422, 425 (Fla.1988). The beneficiary of this error is the State, so it must “ ‘prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.’” Ross, 45 So.3d at 434 (quoting State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986)). We emphasize that the harmless error test does not focus on the strength of the State’s case, but on the effect of the error on the jury. Johnson v. State, 53 So.3d 1003, 1007 (Fla.2010). So even in instances where the State has produced overwhelming evidence of guilt, and we do not think we would characterize the permissible evidence considered by the jury in the instant case as overwhelming, the State may still fail to meet its burden if we determine that there was a reasonable possibility that the error affected the verdict. Johnson; Ventura v. State, 29 So.3d 1086, 1089 (Fla.2010) (holding that the lower court applied the wrong harmless error analysis when it concluded that the detective’s comments on defendant’s silence were “harmless beyond a reasonable doubt given the overwhelming evidence of guilt” (citation omitted)); DiGuilio, 491 So.2d at 1139 (cautioning that the harmless error test is not “an overwhelming evidence test”); see also Cooper v. State, 43 So.3d 42, 43 (Fla.2010) (explaining that the harmless error test “is not a strong evidence test. Rather, the test is ‘whether there is a reasonable possibility that the error affected the verdict.’ ” (quoting DiGuilio, 491 So.2d at 1139)).
During our review of the entire record, we closely examined the permissible evidence the jury could have properly relied upon in reaching its verdict, and we more closely examined the impermissible evidence (the confession), focusing on the effect of the error on the jury. DiGuilio, 491 So.2d at 1138; see also Ventura, 29 So.3d at 1089-90 (quoting DiGuilio). Our analysis reveals that the error was not harmless. In that confession, Horne told several versions of the facts, pointed the finger of blame at a third party, and finally admitted that his previous stories were lies. He then admitted that he planned the murder from beginning to end and that he was the one who shot his father. He further admitted that he did it out of hate and for money. This was by far the most damaging evidence presented in the trial, and we cannot say that the State met its burden of proving that there is no reasonable possibility that the error contributed to Horne’s conviction.
We reverse the convictions for murder, robbery, and possession of a short-barreled shotgun and remand this case for a new trial.
REVERSED AND REMANDED.
EVANDER and BERGER, JJ., concur.

. Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).